SOLOMON PEARL BLUM HEYMANN & STICH LLP
Attorneys for Defendant
Bionutrics, Inc.
40 Wall Street, 35th Floor
New York, New York 10005
(212) 267-7600
David P. Stich

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
BUSHIDO CAPITAL MASTER FUND,
L.P., BCMF TRUSTEES, L.L.C.              :        08 Civ. 0146 (LTS)

                                        :

                Plaintiffs,             :        AFFIDAVIT

        -against-                       :

                                        :

BIONUTRICS, INC.                        :

                Defendant.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

STATE OF NEW YORK      )
                       )        ss.:
COUNTY OF NEW YORK     )

        DAVID P. STICH, ESQ., being duly sworn, deposes and says:

        1.      I am an attorney duly admitted to practice law before the courts of the State of

New York and in the United States District Court for the Southern District of New York, and a

partner in Solomon Pearl Blum Heymann & Stich LLP, attorneys for the Defendant, Bionutrics,

Inc. ("Bionutrics"), now known as Synovics Pharmceuticals, Inc.

        2.      I make this affidavit in support of Bionutrics' motion for an order dismissing this

action for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), and for such

other and further relief as this Court deems just and proper.

3.      The purpose of this Affidavit is to place before the Court a copy of the Amended

Complaint in this action, a copy of which is annexed hereto as Exhibit A.

4.      For all of the reasons set forth in the accompanying memorandum of law, it is

respectfully requested that this Court grant the defendant's motion.

_____
DAVID P. STICH

Sworn to before me this
4th day of April, 2008

_____
Notary Public

MICHAEL J. SEMACK
Notary Public, State of New York
No. 02SE6063861
Qualified in New York County
My Commission Expires December 1, 20 09

2

EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

BUSHIDO CAPITAL MASTER FUND, L.P.                    :    Case No. 08 CV 0146 (LTS)
                                                     :
                                        Plaintiff,   :
                                                     :
                -against-                            :    **AMENDED**
                                                     :    **COMPLAINT**
BIONUTRICS, INC.,                                    :
                                                     :    **JURY TRIAL REQUESTED**
                                        Defendant.   :
------------------------------------------------------------------------X

Plaintiff, BUSHIDO CAPITAL MASTER FUND, L.P. ("Plaintiff"), by and through its

attorneys, as and for its Amended Complaint ("Amended Complaint"), respectfully alleges as

follows:

## NATURE OF THIS ACTION

1.      This is an action to recover sums due pursuant to a Convertible Promissory Note,

dated October 3, 2005 (the "Note"), in which Defendant BIONUTRICS, INC. (the "Defendant")

promised to pay to BUSHIDO CAPITAL MASTER FUND, L.P. the principal sum of Five Hundred

Thousand Dollars ($500,000.00), with interest thereon due and owing at the rate of nine percent (9%)

per annum, and at a rate of eighteen percent (18%) per annum upon and during the continuation of an

event of default. The Note became due and fully payable on April 3, 2007. Defendant has failed to

pay any interest or principal due pursuant to the Note.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332 in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs,

and because there is complete diversity of citizenship among the parties in that the Plaintiff is not a

citizen of either State of which Defendant is deemed a citizen, but is a citizen of different States and a foreign state.

3.      In addition to jurisdiction over the Plaintiff's claim for principal and interest due under the Note, this Court has jurisdiction over the Plaintiff's claim for attorneys' fees, costs and expenses due under the Note pursuant to 28 U.S.C. § 1367(a).

4.      Venue is also proper in this action pursuant to 28 U.S.C. § 1391(a)(2) because a substantial portion of the events or omissions giving rise to the claim occurred within the Southern District of New York, and Defendant expressly consented to venue in this District pursuant to paragraph 21 of the Note.

5.      Paragraph 21 of the Note provides in relevant part:

> Any legal action or proceeding with respect to this Convertible Note may be brought in the courts of the State of New York or of the United States of America sitting in New York County, and, by execution and delivery of this Convertible Note, the [Defendant] hereby accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.

## PARTIES

6.      Plaintiff BUSHIDO CAPITAL MASTER FUND, L.P. is a limited partnership organized and existing under the laws of the Cayman Islands, with its principal place of business located at 145 East 57th Street, 11th Floor, New York, NY 10022.

7.      The sole general partner of Plaintiff BUSHIDO CAPITAL MASTER FUND, L.P. is Bushido Capital Partners, Ltd., a Cayman Islands corporation, with its principal place of business located at 145 East 57th Street, 11th Floor, New York, NY 10022.

8.     Bushido (US) Private Investments, LP, a limited partner of Plaintiff BUSHIDO CAPITAL MASTER FUND, L.P., is organized in Delaware, and maintains a principal place of business in Delaware.

9.     Bushido (Offshore) Private Investments, LP, a limited partner of Plaintiff BUSHIDO CAPITAL MASTER FUND, L.P. is organized in the Cayman Islands, and maintains a principal place of business in the Cayman Islands.

10.     Upon information and belief and at all times mentioned herein, Defendant BIONUTRICS, INC. was and is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business located at 5360 Northwest 35th Avenue, Ft. Lauderdale, FL 33309.

## THE NOTE

11.     On or about October 3, 2005, BUSHIDO CAPITAL MASTER FUND, L.P., at the request of BIONUTRICS, INC., loaned BIONUTRICS, INC. the principal sum of Five Hundred Thousand and 00/100 Dollars ($500,000.00) (the "Loan").

12.     In connection with the Loan, BIONUTRICS, INC. executed in favor of and delivered to BUSHIDO CAPITAL MASTER FUND, L.P. a Note, in the principal amount of Five Hundred Thousand and 00/100 Dollars ($500,000.00) (the "Note"), a true copy of which is annexed hereto and made a part hereof as Exhibit "A."

13.     The Note provides that the full amount of principal and accrued interest was due on the eighteen month anniversary of the issuance date of the Note, or April 3, 2007 (the "Maturity Date").

14.     Pursuant to the Note, accrued interest on the Note became due and payable beginning on April 1, 2006, and thereafter on a quarterly basis.

15.     The Note bears interest at a rate of nine percent (9%) per annum.

16.     The Note provides that if an event of default under the Note has occurred and is continuing, interest shall accrue at a rate of eighteen percent (18%) per annum retroactive to the date of the Note, October 3, 2005, on the amounts due under the Note until the event of default ceases to exist.

## AS AND FOR A FIRST CAUSE OF ACTION

### Breach of Promissory Note

17.     Plaintiff repeats and realleges the allegations contained in paragraphs "1" through "16" as though fully set forth herein.

18.     BIONUTRICS, INC. has failed to comply with the terms and provisions of the Note by failing and omitting to pay to Plaintiff the principal and interest when same became due and payable.

19.     By reason of the foregoing, BIONUTRICS, INC. is in default under the Note.

20.     Pursuant to paragraph 1 of the Note, Plaintiff is entitled to charge interest on the Note at a rate of eighteen percent (18%) per annum on the amounts due under the Note retroactive to October 3, 2005, the date of the Note.

21.     BIONUTRICS, INC. has failed to cure its default despite due demand by Plaintiff in writing in April 2007.

22.     Plaintiff hereby declares the entire principal and interest due and payable in full.

23.     Plaintiff has complied with all the terms and provisions of the Note.

24.     Pursuant to paragraph 10 of the Note, BIONUTRICS, INC. must pay Plaintiff's costs of collection and reasonable attorneys' fees incurred in the investigation, preparation and prosecution of an action or proceeding to enforce the Note.

25.     Plaintiff BUSHIDO CAPITAL MASTER FUND, L.P. seeks to recover the outstanding principal amount under the Note, together with interest, default interest, late charges, and any other amounts to be added pursuant to the terms of the Note, including costs and attorneys' fees.

**WHEREFORE,** Plaintiff demands judgment as follows:

a.     On the first cause of action, in favor of BUSHIDO CAPITAL MASTER FUND, L.P. and against Defendant, in an amount to be determined at trial, but no less than $500,000.00, plus interest accrued at a default rate of 18% from October 3, 2005, late charges, fees, and other amounts due pursuant to the terms of the Note;

b.     For its costs and disbursements in this action, including, but not limited to attorneys' fees; and

c.     That Plaintiff be awarded such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
        March 20, 2008

CROWELL & MORING LLP

By: _____
     Peter R. Ginsberg (PG6712)
     Attorneys for Plaintiff
     BUSHIDO CAPITAL MASTER FUND, L.P.
     153 East 53rd Street, 31st Floor
     New York, New York 10022
     (212) 223-4000

Exhibit A

*Ac # 12967/2.1*

*Cusip 0909469X4*

*Cnip CPN000048*

*SYVC*

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THAT ACT OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.**

*/A = (54,505)*

**BIONUTRICS, INC.**    *DUE*

**CONVERTIBLE PROMISSORY NOTE**

$500,000.00
(Original Principal Amount)

Dated: October 3, 2005
(the "Issuance Date")

FOR VALUE RECEIVED BIONUTRICS, INC., a Nevada corporation (the "Company"), hereby promises to pay to BUSHIDO CAPITAL MASTER FUND, LP (the "Payee"), or its registered assigns, the principal amount of FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) together with interest thereon calculated from the date hereof in accordance with the provisions of this Convertible Promissory Note (as amended, modified and supplemented from time to time, this "Convertible Note" or upon transfer or exchange, the "Convertible Notes").

Certain capitalized terms are defined in <u>Section 9</u> hereof.

1.    <u>Payment of Interest</u>.  Interest shall accrue at a rate equal to nine percent (9%) per annum (the "Interest Rate") beginning on the date of this Convertible Note on the unpaid principal amount of this Convertible Note outstanding from time to time; <u>provided</u> that so long as any Event of Default has occurred and is continuing, interest shall be deemed to accrue, to the extent permitted by law, at the rate of 18% per annum retroactive to the date of this Convertible Note on the unpaid principal amount of this Convertible Note outstanding from time to time through the date on which such Event of Default ceases to exist.  Interest shall be computed on the basis of the actual number of days elapsed and a 360-day year.  Interest on this Convertible Note shall be payable quarterly in arrears beginning on April 1, 2006.

2.    <u>Maturity Date</u>.  The entire principal amount of this Convertible Note and all accrued but unpaid interest thereon shall be due and payable in full in cash in immediately available funds on the eighteen (18) month anniversary of the Issuance Date (the "Maturity Date"), provided that, in the event that the Company consummates a Qualified Equity Financing (as defined in Section 9 below) prior to the eighteen (18) month anniversary of the Issuance Date, the Maturity Date of this Note shall be extended to the third anniversary of the Issuance Date.  Any overdue principal and overdue interest together with any interest thereon shall be due and payable upon demand.

3.    <u>Conversion</u>.  (i) The Payee shall have the option to convert this Convertible Note into common stock of the Company at any time at a conversion price equal to the lesser of (i) $3.00 per share or (ii) 75% of the then current conversion price per common share of the Company's Series A Preferred Stock (as defined in Section 9 below) (the "Conversion Price").  The optional conversion of this Convertible Note shall be deemed to have

been effected as of the close of business on the date on which this Convertible Note has been surrendered for conversion at the principal office of the Company. At the time such conversion has been effected, the rights of the holder of this Convertible Note as the holder of such note shall cease (with respect to the amount so converted), and the Person or Persons in whose name or names any certificate or certificates for shares of the Company common stock are to be issued upon such conversion shall be deemed to have become the holder or holders of record of the shares of such Company common stock (such common stock, the "Conversion Shares") represented thereby.

(ii)    If at any time prior to the earlier of (x) the date of the optional conversion of this Convertible Note into shares of Company common stock or (y) the Maturity Date, (i) the Company consummates a Qualified Equity Financing and (ii) the Company common stock trades at a 30 day trailing average closing price equal to 300% of the then applicable Conversion Price per share and the average Common Stock share volume during such 30 day trailing period equals or exceeds 40,000 shares per day, this Convertible Note shall automatically and without any further action by any Person convert into Company common stock at the then applicable Conversion Price, provided that, this mandatory conversion right will only be applicable to the holder of this Convertible Note if the Company common stock into which this Convertible Note is convertible is subject to an effective registration statement relating to the resale of such common stock at the time of such mandatory conversion.

(iii)    As soon as possible after any conversion of this Convertible Note has been effected (but in any event within three (3) Business Days following such conversion (the "Certificate Delivery Date")), the Company shall deliver to the converting holder an original certificate or certificates representing the number of shares of Company common stock issuable by reason of such conversion in such name or names and such denomination or denominations as the converting holder has specified.

(iv)    The issuance of certificates for shares of Company common stock upon conversion of this Convertible Note shall be made without charge to the holder hereof for any issuance tax in respect thereof or other cost incurred by the Company in connection with such conversion and the related issuance of shares of Company common stock. Upon conversion of this Convertible Note, the Company shall take all such actions as are necessary in order to insure that the Company common stock issuable with respect to such conversion shall be validly issued, fully paid and nonassessable.

(v)    Except as required by applicable law, the Company shall not close its books against the transfer of Company common stock issued or issuable upon conversion of this Convertible Note in any manner which interferes with the timely conversion of this Convertible Note. The Company shall assist and cooperate with any holder of this Convertible Note required to make any governmental filings or obtain any governmental approval prior to or in connection with the conversion of this Convertible Note (including, without limitation, making any filings required to be made by the Company).

(vi)    The Company shall at all times reserve and keep available out of its authorized but unissued shares of Company common stock, solely for the purpose of issuance upon

2

conversion hereunder, such number of shares of Company common stock issuable upon conversion. All shares of such capital stock which are so issuable shall, when issued, be duly and validly issued, fully paid and nonassessable and free from all taxes, liens and charges (except for any such liens created by the Holder). The Company shall take all such actions as may be necessary to assure that all such shares of capital stock may be so issued without violation of any applicable law or governmental regulation or any requirements of any domestic securities exchange upon which such shares of capital stock.

4.    Adjustments of Conversion Price and Number of Conversion Shares. The number of and kind of securities purchasable upon conversion of this Note for shares of the Company's common stock shall be subject to adjustment from time to time as set forth in this Section 4.

(a)    Subdivisions, Combinations, Stock Dividends, Sales and other Issuances. If at any time after the date hereof, the Company shall issue shares of Common Stock or rights, options, warrants or other securities to subscribe for or purchase Common Stock, or securities convertible or exercisable into or exchangeable for Common Stock ("Common Stock Equivalents") (excluding shares, rights, options, warrants, or convertible or exchangeable securities, issued or issuable (i) upon exercise of the Warrants or any other Common Stock Equivalents outstanding as of the date hereof, or issuable in connection with the Company's Series A Preferred Stock offering, (ii) upon conversion of the Series A Preferred Stock, par value $0.01 per share, of the Company, (iii) pursuant to the exercise of any stock options or warrants currently outstanding or options or warrants issued after the date hereof pursuant to any Company benefit plan, stock option plan, stock bonus plan or other equity program approved by the Company's Board of Directors, but only to the extent, that such shares of Common Stock issued or issuable pursuant to such stock option plans, stock bonus plans or stock incentive plans does not exceed ten percent (10%) of the then outstanding Common Stock on a fully diluted basis, or (i) with respect to any issuance or transaction as to which holders of a 66-2/3% of the then outstanding shares of the Company's Series A Preferred Stock, have provided prior written consent), at a price per share lower than the Conversion Price per share of Common Stock in effect immediately prior to such issuance, then the Conversion Price shall be reduced on the date of such issuance to a price (calculated to the nearest cent) determined by multiplying the Conversion Price in effect immediately prior to such issuance by a fraction, (1) the numerator of which shall be an amount equal to the sum of (A) the number of shares of Common Stock on a fully diluted basis (assuming conversion, exchange or exercise of all Common Stock Equivalents) immediately prior to such issuance plus (B) the quotient obtained by dividing the consideration received by the Company upon such issuance by the Conversion Price, and (2) the denominator of which shall be the total number of shares of Common Stock on a fully diluted basis (assuming conversion, exchange or exercise of all Common Stock Equivalents) immediately after such issuance. For the purposes of such adjustments, the maximum number of shares which the holders of any such Common Stock Equivalents shall be entitled to subscribe for or purchase or convert or exchange such securities into shall be deemed to be issued and outstanding as of the date of such issuance (whether or not such Common Stock Equivalent is then exercisable, convertible or exchangeable), and the consideration received by the Company therefor shall be deemed to be the consideration received by

3

the Company for such Common Stock Equivalents, plus the minimum aggregate consideration or premiums stated in such Common Stock Equivalents, to be paid for the shares covered thereby. No further adjustment of the Conversion Price shall be made as a result of the actual issuance of shares of Common Stock on exercise of such Common Stock Equivalents. On the expiration or the termination of such Common Stock Equivalents, or the termination of such right to convert or exchange, the Conversion Price shall forthwith be readjusted (but only with respect to that portion of the Notes which has not yet been exercised) to such Conversion Price as would have obtained had the adjustments made upon the issuance of such Common Stock Equivalents, been made upon the basis of the delivery of only the number of shares of Common Stock actually delivered upon the exercise of such Common Stock Equivalents; and on any change of the number of shares of Common Stock deliverable upon the exercise of any such Common Stock Equivalents, or any change in the consideration to be received by the Company upon such exercise, conversion, or exchange, including, but not limited to, a change resulting from the anti-dilution provisions thereof, the Conversion Price, as then in effect, shall forthwith be readjusted (but only with respect to that portion of the Note which has not yet been converted after such change) to such Conversion Price as would have been obtained had an adjustment been made upon the issuance of such Common Stock Equivalents not exercised prior to such change, or securities not converted or exchanged prior to such change, on the basis of such change.

(b)    Merger, etc. If at any time after the date hereof there shall be a merger or consolidation of the Company with or into or a transfer of all or substantially all of the assets of the Company to another entity, then the Holder shall be entitled to receive upon or after such transfer, merger or consolidation becoming effective, and upon payment of the Conversion Price then in effect, the number of shares or other securities or property of the Company or of the successor corporation resulting from such merger or consolidation, which would have been received by the Holder for the shares of stock subject to this Note had this Note been converted just prior to such transfer, merger or consolidation becoming effective or to the applicable record date thereof, as the case may be. The Company will not merge or consolidate with or into any other corporation, or sell or otherwise transfer its property, assets and business substantially as an entirety to another corporation, unless the corporation resulting from such merger or consolidation (if not the Company), or such transferee corporation, as the case may be, shall expressly assume in writing the due and punctual performance and observance of each and every covenant and condition of this Note to be performed and observed by the Company.

(c)    Reclassification, etc. If at any time after the date hereof there shall be a reorganization or reclassification of the securities as to which conversion rights under this Note exist into the same or a different number of securities of any other class or classes, then the Holder shall thereafter be entitled to receive upon conversion of this Note, during the period specified herein and upon payment of the Conversion Price then in effect, the number of shares or other securities or property resulting from such reorganization or reclassification, which would have been received by the Holder for the shares of stock subject to this Note had this Note at such time been exercised.

4

(d)    For the purposes of the foregoing adjustments, in the case of the issuance of any convertible securities (including, without limitation, shares of Series A Preferred Stock) warrants, options or other rights to subscribe for or to purchase or exchange for, shares of Common Stock ("Convertible Securities"), the maximum number of shares of Common Stock issuable upon exercise, exchange or conversion of such Convertible Securities shall be deemed to be outstanding, provided that no further adjustment shall be made upon the actual issuance of Common Stock upon exercise, exchange or conversion of such Convertible Securities. Upon the expiration of any such Convertible Securities or the termination of any such right to convert or exchange such Convertible Securities, the Exercise Price then in effect hereunder shall forthwith be increased to the Exercise Price which would have been in effect at the time of such expiration or termination had such Convertible Securities, to the extent outstanding immediately prior to such expiration or termination, never been issued, and the Common Stock issuable thereunder shall no longer be deemed to be outstanding.

(e)    In the event of any adjustment in the number of Conversion Shares issuable hereunder upon conversion, the Exercise Price shall be inversely proportionately increased or decreased as the case may be, such that aggregate purchase price for Conversion Shares upon full conversion of this Note shall remain the same. Similarly, in the event of any adjustment in the Conversion Price, the number of Conversion Shares issuable hereunder upon conversion shall be inversely proportionately increased or decreased as the case may be, such that aggregate purchase price for Conversion Shares upon full conversion of this Note shall remain the same.

5.    Method of Payments.

(i)    Payment. So long as the Payee or any of its nominees shall be the holder of any Convertible Note, and notwithstanding anything contained elsewhere in this Convertible Note to the contrary, the Company will pay all sums for principal, interest, premiums, dividends or otherwise becoming due on this Convertible Note held by the Payee or such nominee not later than 5:00 p.m. New York time, on the date such payment is due, in immediately available funds, in accordance with the payment instructions that the Payee may designate in writing, without the presentation or surrender of such Convertible Note or the making of any notation thereon. Any payment made after 5:00 p.m. New York time, on a Business Day will be deemed made on the next following Business Day. If the due date of any payment in respect of this Note would otherwise fall on a day that is not a Business Day, such due date shall be extended to the next succeeding Business Day, and interest shall be payable on any principal so extended for the period of such extension. All amounts payable under this Convertible Note shall be paid free and clear of, and without reduction by reason of, any deduction, set-off or counterclaim. The Company will afford the benefits of this Section to the Payee and to each other Person holding this Convertible Note.

(ii)    Transfer and Exchange. Subject to applicable law, upon surrender of any Convertible Note for registration of transfer or for exchange to the Company at its principal office, the Company at its sole expense will execute and deliver in exchange therefore a new Convertible Note or Convertible Notes, as the case may be, as requested by the holder or

transferee, which aggregate the unpaid principal amount of such Convertible Note, registered as such holder or transferee may request, dated so that there will be no loss of interest on the Convertible Note and otherwise of like tenor; provided that this Convertible Note may not be transferred by Payee to any Person other than Payee's affiliates without the prior written consent of the Company (which consent shall not be unreasonably withheld or delayed). The issuance of new Convertible Notes shall be made without charge to the holder(s) of the surrendered Convertible Note for any issuance tax in respect thereof or other cost incurred by the Company in connection with such issuance, provided that each Convertible Noteholder shall pay any transfer taxes associated therewith. The Company shall be entitled to regard the registered holder of this Convertible Note as the holder of the Convertible Note so registered for all purposes until the Company or its agent, as applicable, is required to record a transfer of this Convertible Note on its register.

(iii)    Replacement.    Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of any Convertible Note and, in the case of any such loss, theft or destruction of any Convertible Note, upon receipt of an indemnity reasonably satisfactory to the Company or, in the case of any such mutilation, upon the surrender and cancellation of such Convertible Note, the Company, at its expense, will execute and deliver, in lieu thereof, a new Convertible Note of like tenor and dated the date of such lost, stolen, destroyed or mutilated Convertible Note.

6.    Representations and Warranties of the Company.    The Company represents and warrants to Payee that:

(i)    Organization and Qualification.    The Company and each of its subsidiaries is an entity duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, with power and authority to conduct its business as it is now being conducted, to own or use its properties and assets that it purports to own or use and, in the case of the Company, to perform its obligations under this Convertible Note. The Company and each of its subsidiaries is duly qualified to do business as a foreign company and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification.

(ii)    Absence of Conflicts.    Neither the execution, delivery and performance of this Convertible Note by Company, nor the consummation of the transactions contemplated hereby, nor compliance by Company with any of the provisions hereof, will (a) violate, conflict with, or result in a breach of any provision of, constitute a default under, or permit or result in the termination of, acceleration of any obligation under, or creation of a lien under any of the terms, conditions or provisions of, (i) the certificate of incorporation, bylaws or stockholders agreements of Company, or (ii) any note, mortgage, agreement, indenture, or license by which Company or any of its properties or assets may be bound, or to which Company or any of its properties or assets may be subject, or (b) violate or conflict with any law, rule, regulation, judgment, ruling, order, writ, injunction or decree applicable to Company or any of its properties or assets.

6

(iii)  Authorization of Agreements, Etc.  Each of (i) the execution and delivery by the Company of this Convertible Note, (ii) the performance by the Company of its obligations hereunder, and (iii) the issuance, sale and delivery by the Company of this Convertible Note has been duly authorized by corporate action of the Company.

(iv)  Validity.  This Convertible Note has been duly executed and delivered by the Company and constitutes the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors rights generally or by equitable principles relating to enforceability.

(v)  Capitalization.  After giving effect to the transactions contemplated by this Convertible Note, the reservation of 1,900,000 shares of Common Stock for employees of the Company, and the issuance of warrants to certain Convertible Noteholders, the capitalization of the Company shall be as reflected in the capitalization table attached hereto as Schedule A.

(vi)  Securities Act.  Assuming the accuracy of the representations of Convertible Noteholders set forth in Section 5 hereof, neither the registration of any security under the Securities Act of 1933, as amended, or the securities laws of any state, nor the qualification of an indenture in respect thereof under the Trust Indenture Act of 1939, as amended, is required in connection with the issuance, execution and delivery of the Convertible Notes in the manner contemplated hereunder.

7.  Covenants of the Company.  The Company covenants and agrees as follows:

(i)  Consolidation, Merger and Sale.  The Company will not (i) consolidate or merge with or into (or permit any subsidiary to consolidate or merge with or into) any other person, or (ii) sell or otherwise dispose of (or permit any subsidiary to sell or otherwise dispose of) a material portion of its property or assets in one or more transactions to, any other person or entity or enter into (or permit any subsidiary to enter into) an agreement with respect to any of the foregoing.

(ii)  Restricted Payments.  The Company will not, and will not permit any of its subsidiaries to:  (i) declare or pay any dividends on, or make any other distribution or payment on account of, or redeem, retire, purchase or otherwise acquire, directly or indirectly, any equity interests of any class of the Company or any subsidiary, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash, property or in obligations of the Company or any of its subsidiaries, (ii) other than in respect to accounts payable in the ordinary course of business, make any payments of principal of, or interest on, or retire, redeem, purchase or otherwise acquire any indebtedness other than this Convertible Note and the other Convertible Notes or (iii) enter into a loan agreement of any kind without receiving the prior written consent of Convertible Noteholders representing a majority of the aggregate principal amount of all Convertible Notes then outstanding.

7

(iii)   <u>Notice of Qualified Equity Financing</u>.  At least three (3) days prior to the closing of any Qualified Equity Financing, the Company shall provide Payee with written notice of such projected closing date, specifying the terms of the transaction and the proposed price per share of Series A Preferred Stock to be paid in such Qualified Equity Financing.  The Company shall promptly provide telephonic notice to Payee of any adjournments or rescheduling of such projected closing date.

(iv)   <u>Convertible Notes</u>.  All Convertible Notes shall be on the same terms and shall be in substantially the same form.  All payments to the holder of any Convertible Note shall be made to all holders of Convertible Notes, pro rata, based on the aggregate principal amount plus accrued but unpaid interest outstanding on such Convertible Notes at such time.

(v)   <u>Senior Status; No Assignment</u>.  Beginning on the Issuance Date and for so long as any Convertible Notes remain outstanding, the Company shall not, without the prior written consent of noteholders holding a majority of the aggregate outstanding principal amount of the Convertible Notes: (a) incur or otherwise become liable with respect to any indebtedness that would rank senior or *pari passu* to the Convertible Notes in order of payment, or (b) make any distribution, transfer, assignment or other disposition of the Company's operating assets (or any interest therein) or encumber of any assets of the Company in any manner.

8.   <u>Events of Default</u>.  If any of the following events takes place before the Maturity Date (each, an "<u>Event of Default</u>"), Payee at its option may declare all principal and accrued and unpaid interest thereon and all other amounts payable under this Convertible Note immediately due and payable; *provided, however*, that this Convertible Note shall automatically become due and payable without any declaration in the case of an Event of Default specified in clause (iii) or (v), below:

(i)   Company fails to make payment of the full amount due under this Convertible Note on a demand following the Maturity Date; or

(ii)   A receiver, liquidator or trustee of Company or any substantial part of Company's assets or properties is appointed by a court order; or

(iii)   Company is adjudicated bankrupt or insolvent; or

(iv)   Any of Company's property is sequestered by or in consequence of a court order and such order remains in effect for more than 30 days; or

(v)   Company files a petition in voluntary bankruptcy or requests reorganization under any provision of any bankruptcy, reorganization or insolvency law or consents to the filing of any petition against it under such law; or

8

(vi)    Any petition against Company is filed under bankruptcy, receivership or insolvency law and such petition is not withdrawn within 60 days following the filing thereof; or

(vii)   Company makes a formal or informal general assignment for the benefit of its creditors, or admits in writing its inability to pay debts generally when they become due, or consents to the appointment of a receiver or liquidator of Company or of all or any part of its property; or

(viii)  An attachment or execution is levied against any substantial part of Company's assets that is not released within 30 days; or

(ix)    Company dissolves, liquidates or ceases business activity, or transfers any major portion of its assets other than in the ordinary course of business; or

(x)     Company breaches any covenant or agreement on its part contained in this Convertible Note or the Subscription Agreement; or

(xi)    Any material inaccuracy or untruthfulness of any representation or warranty of the Company set forth in this Convertible Note or the Subscription Agreement.

9.      <u>Definitions</u>.

"<u>Business Day</u>" means a day (other than a Saturday or Sunday) on which banks generally are open in New York, New York for the conduct of substantially all of their activities.

"<u>Convertible Noteholder</u>" with respect to any Convertible Note, means at any time each Person then the record owner hereof and "Convertible Noteholders" means all of such Convertible Noteholders collectively.

"<u>Equity Financing</u>" means the issuance of stock of the Company to one or more investors for cash following the date of issuance of this Convertible Note.

"<u>Person</u>" means any person or entity of any nature whatsoever, specifically including, without limitation, an individual, a firm, a company, a corporation, a partnership, a limited liability company, a trust or other entity.

"<u>Qualified Equity Financing</u>" shall mean an Equity Financing resulting in cash proceeds to the Company of not less than $3.0 million substantially on the terms set forth in the term sheet attached hereto as <u>Exhibit A</u>.

"Series A Preferred Stock" means the preferred stock of the Company issuable in a Qualified Equity Financing.

10.    Expenses of Enforcement, etc.  The Company agrees to pay all fees and expenses incurred by the Payee in connection with the negotiation, execution and delivery of this Convertible Note (including the reasonable fees of counsel to the placement agent for the Payees).  The Company agrees to pay all reasonable fees and expenses incurred by the Payee in connection with any amendments, modifications, waivers, extensions, renewals, renegotiations or "workouts" of the provisions hereof or incurred by the Payee in connection with the enforcement or protection of its rights in connection with this Convertible Note, or in connection with any pending or threatened action, proceeding, or investigation relating to the foregoing, including but not limited to the reasonable fees and disbursements of counsel for the Payee.  The Company indemnifies the Payee and its directors, managers, affiliates, partners, members, officers, employees and agents against, and agrees to hold the Payee and each such person and/or entity harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel fees and expenses, incurred by, or asserted against, the Payee or any such person and/or entity arising out of, in any way connected with, or as a result of (i) the consummation of the loan evidenced by this Convertible Note and the use of the proceeds thereof or (ii) any claim, litigation, investigation or proceedings relating to any of the foregoing, whether or not the Payee or any such person and/or entity is a party thereto other than any loss, claim, damage, liability or related expense incurred or asserted against the payee or any such person on account of the payee's or such person's gross negligence or willful misconduct.

11.    Amendment and Waiver.  The provisions of this Convertible Note may not be modified, amended or waived, and the Company may not take any action herein prohibited, or omit to perform any act herein required to be performed by it, without the written consent of the holders of a majority of the then outstanding principal amount of all Convertible Notes (including this Convertible Note); provided, however, that any amendment to this Convertible Note which (i) changes the Interest Rate in Section 1 hereof, or (ii) changes the Maturity Date in Section 2 hereof, must be approved in writing by the holders of 100% of the then outstanding principal amount of all such Convertible Notes (including this Convertible Note).

12.    Remedies Cumulative.  No remedy herein conferred upon the Payee is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise.

13.    Remedies Not Waived.  No course of dealing between the Company and the Payee or any delay on the part of the Payee in exercising any rights hereunder shall operate as a waiver of any right of the Payee.

14.    Assignments.  Subject to applicable law, the Payee may assign, participate, transfer or otherwise convey this Convertible Note and any of its rights or obligations hereunder or interest herein to any affiliate of Payee and to any other Person that the Company consents to (such consent not to be unreasonably withheld or delayed), and this Convertible Note

shall inure to the benefit of the Payee's successors and assigns. The Company shall not assign or delegate this Convertible Note or any of its liabilities or obligations hereunder.

15.    Headings. The headings of the sections and paragraphs of this Convertible Note are inserted for convenience only and do not constitute a part of this Convertible Note.

16.    Severability. If any provision of this Convertible Note is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Convertible Note will remain in full force and effect. Any provision of this Convertible Note held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

17.    Cancellation. After all principal, premiums (if any) and accrued interest at any time owed on this Convertible Note have been paid in full, or this Convertible Note has been converted this Convertible Note will be surrendered to the Company for cancellation and will not be reissued.

18.    Maximum Legal Rate.  If at any time an interest rate applicable hereunder exceeds the maximum rate permitted by law, such rate shall be reduced to the maximum rate so permitted by law.

19.    Place of Payment and Notices.  Subject to Section 4(a) above, payments of principal and interest are to be delivered to the Convertible Noteholder of this Convertible Note at the following address: 275 7TH AVENUE, SUITE 2000, NEW YORK, NY 10001, or at such other address as such Convertible Noteholder has specified by prior written notice to the Company.  No notice shall be deemed to have been delivered until the first Business Day following actual receipt thereof at the foregoing address.

20.    WAIVER OF JURY TRIAL.  THE PAYEE AND THE COMPANY EACH HEREBY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS CONVERTIBLE NOTE AND/OR THE TRANSACTIONS CONTEMPLATED HEREUNDER.

21.    Submission to Jurisdiction. Any legal action or proceeding with respect to this Convertible Note may be brought in the courts of the State of New York or of the United States of America sitting in New York County, and, by execution and delivery of this Convertible Note, the Company hereby accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.

(i)    The Company hereby irrevocably waives, in connection with any such action or proceeding, any objection, including, without limitation, any objection to the laying of venue or based on the grounds of forum non conveniens, which they may now or hereafter have to the bringing of any such action or proceeding in such respective jurisdictions.

11

(ii)    Nothing herein shall affect the right of the Payee to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against the Company in any other jurisdiction.

22.    GOVERNING LAW.  ALL ISSUES AND QUESTIONS CONCERNING THE CONSTRUCTION, VALIDITY, ENFORCEMENT AND INTERPRETATION OF THIS CONVERTIBLE NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAW RULES OR PROVISIONS (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the parties have executed and the Company has delivered this Convertible Promissory Note on the date first written above.

COMPANY:

BIONUTRICS, INC.

By: _____

Name: Ronald A. Lane

Title: Pres.

12

## SCHEDULE A

## CAPITALIZATION TABLE

*Bionutrics, Inc. Fully Diluted Shares Outstanding as of September 12, 2005*

| | |
|---|---:|
| Shares Outstanding as of 09/12/05 | 22,681,725 |
| Unexercised Options & Warrants | 129,000 |
| Unexercised Warrants | 170,000 |
| Series A Preferred Shares, As Converted | 118,370 |
| Accumulated Series A Preferred Dividends | 46,440 |
| TOTAL | 23,145,535 |

## EXHIBIT A

### OFFERING SUMMARY

### EQUITY PLACEMENT TERM SHEET

**Issuer:**      Bionutrics, Inc. ("the <u>Company</u>")

**Placement Agent:**      Indigo Securities, LLC (the "<u>Placement Agent</u>")

**The Offering:**      Series A Convertible Preferred Stock (the "<u>Series A Preferred</u>"), initially convertible on a 1:4 basis into shares of the Company's Common Stock (the "<u>Common Stock</u>") and warrants to acquire 25% of the Common Stock into which the Series A Preferred is initially convertible (the "<u>Warrants</u>" and, together with the Series A Preferred, the "<u>Securities</u>") at an exercise price equal to 150% of the Original Purchase Price (as defined below). The Warrants shall be exercisable for five years. In addition, the Company's currently outstanding indebtedness and preferred stock must be converted into Common Stock as a condition to closing of the Offering.

**Amount of Financing:**      A minimum of $3,000,000 and a maximum of $6,000,000 of Securities. This investment shall close for all investors upon the earliest of the date (i) the parties agree to terminate the offering or (ii) the sale of $6 million of Securities, provided that the Placement Agent shall have an over allotment option to sell an additional 10% of the Maximum Offering. Conversion of the Company's Secured Notes shall not be included in the amount of the financing.

**Price:**      $16 per share of Series A Preferred convertible into four shares of common stock (the "<u>Original Purchase Price</u>").

**Investor(s):**      Accredited Investors introduced to the Company by the Placement Agent.

**Escrow Arrangements:**      Investors shall fund their investment into escrow with a mutually acceptable escrow agent. The escrow shall be released as soon as the aggregate amount funded into escrow equals or exceeds $3,000,000.

**Fees and Expenses:**

The Placement Agent shall receive as compensation in connection with the Offering: (i) 9% of the gross proceeds of the Offering in cash; and (ii) warrants (the "Agent Warrants") exercisable for 9% of the number of shares of Series A Preferred sold in the Offering. The Agent Warrants shall be exercisable at a price equal to the Original Purchase Price per share. The Placement Agent and its affiliates and counsel shall have the right to purchase Securities in the Offering net of cash commissions and shall receive its pro rata share of the Agent Warrants in connection with any such investment. The Company shall pay the reasonable fees and expenses, including reasonable legal fees of the Placement Agent, incurred by the Placement Agent in connection with the Offering.

**Anticipated Closing Date**    [October 31, 2005] (the "Closing").

**TERMS OF SERIES A PREFERRED STOCK**

**Dividends:**

The holders of the Series A Preferred shall be entitled to receive cumulative dividends in preference to any dividend on the Common Stock at the rate of 8% of the Original Purchase Price per annum, accruing on a semi-annual basis in cash or additional shares of Series A Preferred (which shall be valued at the Original Purchase Price per share). The holders of Series A Preferred also shall be entitled to participate pro rata in any dividends paid on the Common Stock on an as-if-converted basis.

**Liquidation Preference:**

In the event of any liquidation or winding up of the Company, the holders of the Series A Preferred shall be entitled to receive in preference to the holders of the Common Stock a per share amount equal to the Original Purchase Price plus any accrued, but unpaid, dividends (the "Liquidation Preference"). After the payment of the Liquidation Preference to the holders of the Series A Preferred, the remaining assets shall be distributed ratably to the holders of the Common Stock and the Series A Preferred on an as if converted basis. A merger, acquisition, sale of voting control or sale of all or substantially all of the assets of the Company in which the pre-transaction shareholders of the Company do not own a majority of the outstanding shares of the surviving corporation shall be deemed to be a liquidation.

**Conversion:**

The holders of the Series A Preferred shall have the right to convert any or all of the Series A Preferred, at any time, into shares of Common Stock. The initial conversion rate shall be 1:4, subject to adjustment as provided below.



| | |
|---|---|
| **Antidilution Provisions:** | The conversion price of the Series A Preferred and the exercise price of the Warrants will be subject to a weighted-average antidilution adjustment (based on all outstanding shares of Preferred and Common Stock) to reduce dilution in the event that the Company issues additional equity securities (other than: (a) up to 1,900,000 shares issued pursuant to reserved employee options, and (b) a one time issuance of up to $2,000,000 in additional equity securities during the twelve (12) month period following the final closing date of the Offering) at a purchase price less than (i) the applicable conversion price in the case of the Series A Preferred or (ii) the applicable exercise price in the case of the Warrants. The conversion price and exercise price will also be subject to proportional adjustment for stock splits, stock dividends, recapitalizations and the like. |
| **Voting Rights:** | Except as otherwise provided herein, the Series A Preferred will vote together with the Common Stock on an as if converted basis and not as a separate class except as specifically provided herein or as otherwise required by law. Each share of Series A Preferred shall have a number of votes equal to the number of shares of Common Stock then issuable upon conversion of such share of Series A Preferred. |
| **Board of Directors:** | The size of the Company's Board of Directors shall be set at five (5). The Board of Company will elect Edward Neugeboren to the Board prior to close and Nirmal Mulye and Ronald Lane shall agree to vote their respective shares of Common Stock for the next shareholders meetings in favor of the election of Mr. Neugeboren to a one-year term on the Board. The placement agent shall also be entitled to observer rights at all board meetings. |
| **Notification Rights:** | The Company shall provide the Placement Agent with written notice of any and all future debt or equity financings upon execution of a term sheet or letter of intent in connection with such financing and in no event less than ten (10) business days prior to closing such financing. |
| **Right of First Refusal:** | The Placement Agent shall have a right of first refusal to serve as (i) placement agent with respect to future security issuances and (ii) financial advisor in any merger, acquisition, sale or similar transaction by the Company (other than an underwritten public offering) for a period of two (2) years following the final closing of the Offering. |
| **Protective Provisions:** | For so long as at least 25% of the Series A Preferred remains outstanding, consent of (i) Edward Neugeboren, if he is a member |

of the Board of Directors of the Company at the time, or (ii) holders of a majority of the shares of Series A Preferred then outstanding, shall be required for any action that (i) alters or changes the rights, preferences or privileges of the Series A Preferred, (ii) constitutes the incurrence of indebtedness by the Company (other indebtedness incurred in the ordinary course of the Company's business, consistent with past practice) which possesses senior repayment rights to the Series A Preferred, except for acquisition indebtedness (or guarantees thereof) used to acquire the shares of Kirk Pharmaceuticals, LLC, and its affiliate, Andapharm, LLC, or an refinancing of such acquisition indebtedness, (iii) creates (by reclassification or otherwise) any new class or series of shares or securities having rights, preferences or privileges senior to, or on a parity, with the Series A Preferred, (iv) results in the redemption of any shares of Common Stock (other than pursuant to equity incentive agreements with service providers giving the Company the right to repurchase shares upon the termination of services), (v) results in any merger, other corporate reorganization, sale of control, or any transaction in which all or substantially all of the assets of the Company are sold, (vi) amends or waives any provision of the Company's Articles of Incorporation or Bylaws relative to the Series A Preferred, (vii) increases the authorized size of the Company's board, (viii) results in the payment or declaration of any dividend on any shares of Common Stock, (ix) results in a confession of judgment against the Company, or settle or compromise by or against the Company (provided that no such consent shall be required for matters involving less than $500,000.00), (x) file for bankruptcy or receivership, (xi) results in any material loans to any insider or shareholder or any guaranty of any debt of a third party, other than in the ordinary course of business; (xii) results in the removal of one of the following officers of the Company other than for "cause": Chief Executive Officer, President and Chief Financial Officer, or the material modification of the compensation payable by the Company to any such officer, (xii) results in the making of any material investments other than in the ordinary course of business, (xiv) results in the mortgaging, pledging, or creating a security interest in the property of the Company, other than in the ordinary course of business consistent with past practice, (xiii) results in the Company entering into new businesses not related to the purpose of the Company, (xvi) or (xvi) results in the consummation of any material contracts with any shareholder, insider or affiliates, except those in place as of the closing date or anticipated in the next twelve (12) months with Nostrum Pharmaceuticals, Inc. ("Nostrum") as required to develop and

4

execute the Company's technology license agreement with Nostrum.

**Information Rights:**

So long as any Investor continues to hold shares of Series A Preferred or Common Stock issued upon conversion of the Series A Preferred, the Company will furnish the Placement Agent with monthly management reports as well as confidential monthly financial statements compared against the Company's annual operating plan and will provide a copy of the Company's confidential annual operating plan within 30 days prior to the beginning of the fiscal year. Each Investor shall also be entitled to standard inspection and visitation rights under the Nevada Revised Statutes.

**Registration Rights:**

<u>Upfront Registration:</u>  The Company shall cause a Registration Statement (the "<u>Initial Registration Statement</u>") covering the 125% of the Common Stock (i) into which the Series A Preferred is convertible and (ii) for which the Warrant and Agent Warrants are exercisable (the "<u>Registrable Securities</u>") to become effective no later that 120 days from the Closing Date (the "Required Effective Date"). The Company shall use its best efforts to maintain the effectiveness of this Registration Statement until the date (the "Registration Termination Date") which is the earlier of (i) the second anniversary of the Closing Date, (ii) the date upon which the last Registrable Security included in such Registration Statement is sold by the holder thereof, and (iii) the date upon which all investors may sell their Registrable Securities without limitation by virtue of paragraph (e) of Rule 144 under the Securities Act of 1933, as amended. Penalty for default: (i) for the first two one month periods of delay after the Required Effective Date, the penalty shall be 1.0% per month payable in cash or stock valued at the Original Purchase Price; and (ii) for each additional month, 2.5% per month payable in cash or stock valued at the Original Purchase Price. The penalty for partial months shall be pro rated.

<u>Demand Rights:</u>  If for some reason the Initial Registration Statement is not effective at any time during the period beginning 120 days after the Closing Date, Investors holding more than $500,000 in value of the Registrable Securities may require the Company to use its best efforts efforts to cause such Registrable Securities to be registered. The Investors' demand registration rights shall expire two years after the effectiveness date of the Upfront Registration covering all Registrable Securities.

<u>Company Registration</u>:  The Investors shall be entitled to "piggy back" registration rights on all registrations of the Company (other than registrations on Forms S-8, S-4 or any successor or similar forms) or on any demand registrations of any other investor subject to the right, however, of the Company and its underwriters to reduce the number of shares proposed to be registered in view of market conditions.  If the Investors are so limited, however, no party shall sell shares in such registration other than the Company or the investor, if any, invoking the demand registration.  No shareholder of the Company shall be granted piggyback registration rights which would reduce the number of shares includable by the holders of the Registrable Securities in such registration without the consent of the holders of at least two-thirds of the Registrable Securities.  Investors' piggy-back registration rights shall expire two years after the effectiveness date of the Upfront Registration covering all Registrable Securities.

In connection with an underwritten public offering of securities of the Company, upon the request of the managing underwriter, each holder of Registrable Securities who owns at least 2% of the outstanding capital stock of the Company on an "as-converted" basis or is an officer or director of the Company shall agree (provided all other officers and directors also agree) not to effect any public sale or distribution (other than those included in the registration) of any securities of the Company, or any securities, options or rights convertible into or exchangeable or exercisable for such securities during the sixty (60) day period beginning on such effective date, unless the managing underwriter otherwise agrees to a shorter period of time.

<u>S-3 Rights</u>.  Investors shall be entitled to unlimited demand registrations on Form S-3 (if available to the Company) so long as such registered offerings are not less than $1,000,000.

<u>Limitation on Piggyback & S-3 Rights</u>.  The Investors' "piggy back" and S-3 registration rights shall not apply during any period that there exists an effective registration statement covering the Investors' Registrable Securities.

<u>Expenses</u>:    The Company shall bear registration expenses (exclusive of underwriting discounts and commissions and expenses of counsel) of all such demands, piggy-backs, and S-3 registrations (including the expense of one special counsel of the selling shareholders).

6

Transfer of Rights:  The registration rights may be transferred to (i) any partner or retired partner of any holder which is a partnership, (ii) any family member or trust for the benefit of any individual holder, or (iii) any transferee who acquires at least 5,000 shares of Registrable Securities; in each case, provided that the Company is given written notice thereof.

Other Provisions:  Other provisions shall be contained in the Investor Rights Agreement with respect to registration rights as are reasonable, including cross indemnification, the period of time in which the Registration Statement shall be kept effective and underwriting arrangements.

Pre-Emptive Rights:

Investors shall have the right in the event the Company sells equity securities, convertible securities or warrants to any person to purchase their pro rata portion of such shares for a period of 30 days after the closing of such sale.  Any securities not subscribed for by an eligible Investor may be reallocated among the other eligible Investors.  Such keep even right will not apply to any underwritten public offering of Company equity securities by a internationally, nationally, or regionally recognized underwriter, at a price per share of Common Stock no less than three times the Original Purchase Price.

Subscription Agreement:

The investment shall be made pursuant to a Subscription Agreement reasonably acceptable to the Company and the Investors, which agreement shall contain, among other things, appropriate representations and warranties of the Company, covenants of the Company reflecting the provisions set forth herein and appropriate conditions of closing, including an opinion of counsel for the Company.  The Subscription Agreement shall provide that it may only be amended and any waivers thereunder shall only be made with the approval of the holders of two-thirds of the Series A Preferred.  Registration rights provisions may be amended or waived solely with the consent of the holders of two-thirds of the Registrable Securities.

**EMPLOYEE MATTERS**

Employee Option Pool:

Upon the Closing of this financing, 1,900,000 shares of Common Stock will have been reserved for issuance pursuant to employee options.

Stock Vesting:

All stock and stock equivalents issued after the Closing to employees, directors, consultants and other service providers will be subject to vesting as follows: 33% to vest at the end of the first

7

year following such issuance, with the remaining 66% to vest monthly over the next two years. The repurchase option shall provide that upon termination of the employment of the shareholder, with or without cause, the Company or its assignee (to the extent permissible under applicable securities law qualification) retains the option to repurchase at cost any unvested shares held by such shareholder.

**Proprietary Information and Inventions Agreement:**   Each officer, employee and consultant of the Company shall have entered into an acceptable proprietary information and inventions agreement.

**Forced Conversion:**   If at any time prior to the conversion of the Series A Preferred into shares of Common Stock, the Common Stock trades at a 30 day trailing average closing price equal to 300% of the equivalent effective purchase price per share of Common Stock in this Offering and the average Common Stock share volume during this 30 day trailing period equals or exceeds 40,000 shares per day and the Common Stock into which the Series A Preferred is covered by an effective registration statement at such time, the Series A Preferred shall automatically convert into Common Stock at the then applicable conversion price. In the event of such conversion, all preferences and other special provisions described and provided for herein to the Series A Preferred or related Warrants including protective provisions, information rights and pre-emptive rights, shall become null and void, except that the registration rights shall remain and the Company will be required to perform as described herein.

## OTHER MATTERS

**Conditions Precedent to Financing:**

1.   Completion of legal documentation satisfactory to the Placement Agent and prospective Investors.

2.   Execution of mutually agreeable employment agreements with key employees including: John S. Copanos, Nirmal Mulye and Ronald H. Lane, Ph.D.

3.   Bionutrics' receipt of DEA approval in connection with the acquisition of Kirk Pharmaceuticals.

4.     Conversion of outstanding Bionutrics (i) Revolving Note in the principal amount of approximately $1,500,000 and (ii) preferred equity to common stock.

5.     Satisfactory completion of due diligence by the Placement Agent and prospective Investors (including a complete review of all requested Nostrum Pharmaceutical's due diligence materials).

6.     Conversion of B. Berk's Nostrum Pharmaceutical's shares to Bionutrics shares.

**Exclusivity:**

The Company agrees that until November 30, 2005, or such earlier date as the Company and Placement Agent mutually agree to terminate the Offering (the "Termination Date"), neither the Company or any of its affiliates, officers, directors, employees, agents or representatives who are aware of the discussions between the Company and Placement Agent will, either directly or indirectly, solicit, entertain or conduct discussions with any person with respect to any offer relating to the sale of securities of the Company. The term "person" as used in herein shall be interpreted to include without limitation any individual, corporation, limited liability Company, unincorporated association, partnership, trust, estate or other entity.

**Capitalization:**

The Company is authorized to issue 50,000,000 shares of which 45,000,000 shares, par value $.001 per share, are designated as Common Stock ("Common Stock") and 5,000,000 shares, par value $.001 per share, are designated as Preferred Stock ("Preferred Stock"). A complete capitalization table as of the date hereof is attached above as Schedule A.

In addition, the Placement Agent's affiliate, Indigo Ventures LLC, shall purchase a three (3) year warrant from the Company ("Indigo Ventures Warrant") for 500,000 shares of Common Stock with an exercise price equal to $5.00 per share. The aggregate purchase price for the Indigo Ventures Warrant shall be $150,000. Such purchase price may be paid by Indigo Ventures LLC, at its option, through the issuance of a partial recourse note.

**Governing Law:**

The definitive documentation relating to the offering of the Securities shall be governed by and construed in accordance with the laws of the State of New York.

**Additional Information:**

For additional information regarding the Company generally and for Management's Discussion and Analysis of the Company's

Financial Condition and Results, please see the 10-K and 10-Q
attached as exhibits hereto.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BUSHIDO CAPITAL MASTER FUND,            :
L.P., BCMF TRUSTEES, L.L.C.,

                                      :

               Plaintiffs,

                                        :        08 Civ. 0146 (LTS)

    -against-

                                          :        AFFIDAVIT OF SERVICE

BIONUTRICS, INC.,

               Defendant.

                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STATE OF NEW YORK    )
                          )   ss.:
COUNTY OF NEW YORK  )

YESENIA ZEA, being duly sworn, hereby deposes and says:

    1.     I am over eighteen years of age, not a party to this action and reside in Queens, New York.

    2.     On April 4, 2008, I served one copy of the annexed AFFIDAVIT OF DAVID P. STICH, ESQ., by depositing the same, enclosed in a securely sealed first class postage paid envelope, in an official depository under the exclusive care and custody of the United States Postal Service within the State of New York addressed to:

        Crowell & Moring LLP
        Attorneys for Plaintiffs
        Attn.: Peter R. Ginsberg
        153 East 53rd Street, 31st Floor
        New York, New York 10022
        Telephone: (212) 223-4000

                                                    _____
                                                  Yesenia Zea

Sworn to before me this
4th day of April, 2008

_____
  Notary Public

                   Jill H. Teitel
           Notary Public, State of New York
             Registration #02TE5069470
             Qualified in Kings County
          My Commission Expires Nov. 25, 2010